**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| RICHARD SOTO | : | |
| Appellant | : | No. 1053 MDA 2021 |

Appeal from the Judgment of Sentence Entered February 25, 2021
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0002599-2014

BEFORE:    BOWES, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED AUGUST 09, 2022**

Richard Soto (Appellant) appeals from the judgment of sentence entered in the Dauphin County Court of Common Pleas, following his jury convictions of rape of a child[1] and related offenses.  Appellant argues the trial court erred in: (1) denying relief on his **Brady** violation claim;[2] (2) permitting the minor victim to testify with a comfort dog; and (3) not charging the jury charge as to the victim's admission that she lied at the preliminary hearing.  We affirm.

## I.  Facts & Procedural History

The Commonwealth charged Appellant with rape of a child and related offenses, arising from his repeated sexual abuse of M.M. (the Victim), the then

---

[1] 18 Pa.C.S. § 3121(c).

[2] **See Brady v. Maryland**, 373 U.S.83 (1963).

five-year-old daughter of his live-in paramour.[3]  At a first trial in November of 2015, the jury found Appellant guilty of rape of a child and related offenses, and the trial court subsequently imposed an aggregate sentence of 20 to 40 years' imprisonment.  In April of 2017, on direct appeal, this Court affirmed the judgment of sentence.[4]

Appellant then filed a timely Post Conviction Relief Act[5] petition, raising several claims of trial counsel's ineffectiveness.  Following a hearing, the PCRA court denied relief.  On appeal, however, a panel of this Court reversed, concluding trial counsel was ineffective for not calling character witnesses.[6] This Court vacated the judgment of sentence and remanded for a new trial.

The new trial commenced on November 2, 2020.  The Commonwealth first called Diane Higgins, the Victim's learning support teacher in 2013.  At that time, the Victim was eight years old, was in second grade, but was generally "functioning intellectually" a year behind, as if "on a first grade level."  N.T. Jury Trial Vol. I, 11/2/20, at 39-40.  Around Halloween of that year, Higgins directed the class to "complete a drawing of a monster."  *Id.* at

---

[3] M.M. was born in May of 2005.  N.T., Jury Trial Vol. II, 11/3/20, at 86.

[4] *Commonwealth v. Soto*, 840 MDA 2016 (unpub. memo.) (Pa. Super. Apr. 13, 2017).

[5] 42 Pa.C.S. §§ 9541-9546.

[6] *Commonwealth v. Soto*, 170 MDA 2019 (unpub. memo. at 22) (Pa. Super. Sept. 13, 2019).

45. The Victim complied with the assignment but covered the paper with her hand. *Id.* at 46, 49. Higgins described the monster, drawn by the Victim, as having "a penis with yellow stuff coming out of it." *Id.* at 48. Higgins immediately reported this drawing to the school guidance counselor, Anna Smith. *See id.* at 50.

Guidance Counselor Smith testified to the following: she talked with the Victim the next day. N.T., 11/2/20, at 66. When asked what was between the monster's legs, the Victim responded, "[I]t was a pipe that went over the toilet that pee came out of." *Id.* at 68. Upon further questioning, the Victim "said she had a secret," which "had to do with sex." *Id.* at 68. The Victim stated "her mom's boyfriend Rich . . . put his winky in her mom and that he put it in her." *Id.* at 69. The Victim explained: a "winky" "was his private part[;]" "he put it in her parties [sic]" and "moved it back and forth," "put the winky in her mouth and . . . move[d] it with his hands," and "put his winky in her butt[;]" and "green stuff" came out of "the hole of his winky[.]" *Id.* at 69-70. The Victim also told Smith "that she tried to tell her mom," but "[h]er mother didn't believe her and . . . whooped her."[7] *Id.* at 72. Smith reported these allegations to the authorities. *Id.* at 75.

_____

[7] Following the report, the Victim lived with her grandmother, while the Victim's two younger siblings remained with their mother. The Victim's mother testified as a defense witness at the first trial in 2015; she did not believe the abuse occurred, denied that the Victim told her about the abuse,

*(Footnote Continued Next Page)*

At the beginning of the second day of trial, Appellant's counsel advised he had learned the Victim would testify with a comfort dog, and objected.[8] N.T., 11/3/20, at 83. He argued it would be "unfairly prejudicial," would send "a signal that [Appellant] is somebody who was feared[,]" and would bolster Victim's credibility. *Id.* Appellant also cited "due process grounds," without any further explanation. *Id.* The Commonwealth responded: therapy dogs were "routinely allowed" in Dauphin County; the jurors would not "even see the dog," who would be behind a barrier; and it was "traumatic" for the 15-year old Victim to testify about sexual abuse at the hands of Appellant. *Id.* The trial court permitted the comfort dog. We note its sole explanation to the jury was, "[A]s you can see, there's a service dog here. The dog's name is Dublin, and the dog's handler, Cathy, will be seated behind." *Id.* at 84. No further mention about the dog was made, and the trial transcript does not indicate any disruption caused by or related to the dog. *See id.* at 85-145.

The Victim then testified to the following: at the time of trial, she was 15 years old. N.T., 11/3/20, at 86. She was five years old when Appellant

_____

and was still engaged to Appellant. *Soto*, 170 MDA 2019 at 6. Appellant also testified at the first trial.

Neither the mother nor Appellant testified at the second trial in 2020. At that time, the Victim was living with her grandparents, while her mother and younger siblings were living in Louisiana. N.T., 11/3/20, at 89-90.

[8] On appeal, Appellant's counsel avers he did not know about the comfort dog until they walked into the courtroom that day. Appellant's Brief at xiii.

- 4 -

moved in with her family. *Id.* at 93. Approximately two weeks thereafter, she was watching television with her two younger siblings when Appellant told her to go to his bedroom. *Id.* at 95-96. Appellant told her to pull down her pants and lay on the bed, and he unbuckled his pants and "put his penis" in her vagina. *Id.* at 96-98. The Victim laid still on her back while Appellant "rocked with his penis." *Id.* at 99-100. On another occasion, Appellant "made [the Victim] go on the bed like a doggie[,] and started pushing [his penis] forward and backwards into [her] butt." *Id.* at 102. Additionally, twice Appellant put his penis in the Victim's mouth "and green stuff came out." *Id.* at 105. Appellant also touched the Victim's vagina with his hands and "lick[ed]" her vagina. *Id.* at 110.

The Victim further testified she once told her mother about these incidents. N.T., 11/3/20, at 113-14. The Victim stated her mother "didn't believe" her, "was upset with" her, but did not do anything. *Id.* at 114. However, upon being shown her own prior testimony in this matter,[9] the Victim stated her mother "spanked" her, and the following day, Appellant told the Victim that "if [she told] again he will kill" her. *Id.* at 116.

_____

[9] While the transcript indicates this prior testimony was given "seven years" earlier, there was no further explanation about the hearing in which it was given. *See* N.T., 11/3/20, at 115. We note that on cross-examination, defense counsel showed the Victim her preliminary hearing testimony of May 7, 2014. *Id.* at 135.

Relevant to Appellant's **Brady** claim, we note that although the Commonwealth had, on its witness list, the lead detective in this matter — Middletown Police Detective Mark Hovan, — it chose not to call him before resting its case-in chief.  Appellant, however, called Detective Hovan to testify as if on cross-examination.  N.T. Jury Trial Vol. III, 11/4/20, at 235-36. Pertinently, Detective Mark Hovan stated he was "retired" from the police department.  **Id.** at 237.

Appellant also called two character witnesses, but did not testify himself. The jury found him guilty of rape of a child, involuntary deviate sexual intercourse with a child (IDSI), aggravated indecent assault of a child, indecent assault of a child under 13 years of age, corruption of minors, and unlawful contact with a minor.[10]

Thereafter, on November 19, 2020, Appellant filed a motion for extraordinary relief, alleging the Commonwealth committed a **Brady** violation by not disclosing Detective Hovan had been suspended from the police department, and had resigned "instead of accepting the suspension."[11] Appellant's Motion for Extraordinary Relief due to Prosecutorial Misconduct, 11/19/20, at 2 (unpaginated).  Appellant averred, "News report indicate that

---

[10] 18 Pa.C.S. §§ 3123(b), 3125(b), 3126(a)(7), 6301(a)(1).

[11] The trial court explained that Detective Hovan was suspended in January of 2018, which was after Appellant's first trial, but before the second trial.  **See** Trial Ct. Op., 7/6/21, at 5.

Detective Hovan . . . conduct[ed] personal business such as attending church services while clocked in at work[,]" was "warned not to do this [but] disobeyed a direct order from the police chief[.]" *Id.* Appellant stated he was not aware of this history at the time of trial, and thus could not examine the detective about the suspension. *Id.* at 3 (unpaginated). Upon the trial court's direction, the Commonwealth filed an answer.

The trial court then conducted a sentencing hearing on February 25, 2021. Appellant first argued in support of his *Brady* claim. The court denied the motion for extraordinary relief, without prejudice for Appellant to re-raise the issue in a post-sentence motion. N.T. State Sentence, 2/25/21, at 8. The court then imposed two consecutive terms of 10 to 20 years' imprisonment, on the rape of a child and IDSI counts, as well as concurrent sentences on the remaining counts. Appellant's aggregate sentence, 20 to 40 years, was thus identical to the prior aggregate sentence, imposed in 2016. Finally, Appellant was directed to register for life as a Tier-III offender under the Sex Offender Registration and Notification Act (SORNA).[12] *Id.* at 25.

Appellant filed a timely post-sentence motion, again presenting a claim of a *Brady* violation, as well as challenging the presence of the comfort dog

---

[12] 42 Pa.C.S. §§ 9799.10 to 9799.75. *See* 42 Pa.C.S. §§ 9799.14(d)(2) (conviction of rape, 18 Pa.C.S. § 3121, is a Tier III sexual offense), 9799.15(a)(3) (individual convicted of a Tier III sexual offense shall register for life).

at trial. The trial court held a hearing on June 8, 2021. The Commonwealth had submitted Detective Hovan's police disciplinary records for the court's *in camera* review. N.T. Post-Sentence Hearing, 6/8/21, at 3. The Commonwealth also called the trial prosecutor, Erin Varley, Esquire, who testified, *inter alia*, that when she was assigned the underlying criminal matter in January of 2020, she was not aware Detective Hovan had any disciplinary issues, and she did not learn of it until **after** trial, when defense counsel contacted her. N.T. Post-Sentence Hearing, 6/8/21, at 6.

The trial court denied the post-sentence motion on July 6, 2021. Appellant filed a timely notice of appeal, and following a timely request for an extension of time, complied with the court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.[13]

## II. Statement of Questions Involved

Appellant presents the following issues for our review:

> I. Whether the trial court erred in denying the motion for extraordinary relief and post-sentence motions seeking a new trial where the Commonwealth committed a **Brady** violation by failing to disclose that the affiant had been disciplined for conducting personal business while on the clock as a police officer and in

---

[13] The trial court's Rule 1925(b) order was entered on August 12, 2021, but the corresponding docket entry states notice to the parties was not given until the next day, August 13th. The 21-day period for filing the statement thus did not commence until the later date, and ended August 3rd. **See** Pa.R.Crim.P. 114(C)(2)(c) (docket entries shall contain date of service). Appellant timely filed his request for an extension of time on August 3rd, and subsequently filed the Rule 1925(b) statement before the court's new deadline of October 4th.

response to the discipline, the affiant had resigned and sued the police department[?]

II. Whether the trial court erred in reviewing the disciplinary record for the assigned detective *ex parte* in chambers instead of requiring the Commonwealth to provide a copy of the records to the defense[?]

III. Whether the trial court abused its discretion in permitting the complainant to testify with the aid of a comfort dog where the trial court did not comply with any of the procedures required by **Commonwealth v. Purnell**, 259 A.3d 974, 986 (Pa. 2021), such as providing advance notice and holding a hearing, minimizing the ability of the jurors to see the dog, providing a cautionary instruction, and holding an individualized hearing to determine whether the complainant in fact needed the dog in order to testify truthfully[?]

IV. Whether the trial court erred in failing to instruct the jury as to certain testimony subject to special scrutiny, Pennsylvania Standard Criminal Instruction 4.06, because the complainant testified at the preliminary hearing that she had lied under oath about the allegations in this case[?]

Appellant's Brief at viii-ix.[14]

### III. *Brady* Violation

In his first issue, Appellant reiterates the Commonwealth committed a

***Brady*** violation, for which he is entitled to a new trial. Our review of a ***Brady***

violation ruling "presents a question of law, for which our standard of review

---

[14] Appellant raised an additional issue in his Rule 1925(b) statement — that the trial court erred in denying his motion *in limine* to preclude admission of the Victim's monster drawing. However, he has abandoned this issue on appeal.

is *de novo* and our scope of review is plenary." ***Commonwealth v. Bagnall***, 235 A.3d 1075, 1084 (Pa. 2020).

Appellant avers the following: "There is no question the Commonwealth knew about the evidence[,]" it "affirmatively misrepresented that Detective Hovan had 'retired'" from the police force, and it knowingly failed to disclose the correct information. Appellant's Brief at 2, 5-6. He insists the trial court erred in concluding "the defense should have uncovered this information on its own," where "the entire burden of ***Brady*** falls on the Commonwealth[, the] defense has no duty to seek out material[,]" and it was "immaterial" whether the evidence was a matter of public record. Appellant's Brief at 6, 7, *citing*, *inter alia*, ***Dennis v. Sec'y, Pa. Dep't of Corr.***, 834 F.3d 263, 284 (3d Cir. 2016) (*en banc*). Furthermore, the ***Brady*** evidence was material because it would have impeached Detective Hovan, who was "at least the second most important witness." Appellant's Brief at 9. The defense theory at trial was "that Detective Hovan had done a solid investigation which did not undercover any other evidence of sexual assault because the assault had not occurred."[15] ***Id.*** Had the ***Brady*** evidence been provided, the defense strategy "likely would have changed," as the credibility of both Detective Hovan and the investigation would have been in doubt. ***Id.*** at 10. "[T]he jury would have

_____

[15] Appellant also avers, however, that Detective Hovan "was not particularly credible on the stand." Appellant's Brief at 9.

heard that [the Victim] was interviewed by a detective who cannot follow police directives[ ]" and was terminated due to misconduct.  *Id.* at 12.

In his second issue, Appellant argues in the alternative that he "should be permitted to inspect Detective Hovan's disciplinary records, so that [he] can brief the issues with access to the actual facts."  Appellant's Brief at 14.  Appellant maintains that a defendant "is entitled to review records where [they have] articulated a reason to believe that the records may contain exculpatory information."  *Id.* at 16.  We conclude no relief is due.

Our Supreme Court has explained:

> *Brady* and subsequent precedent . . . impose[ ] upon a prosecutor the obligation to disclose all favorable evidence that is material to the guilt or punishment of an accused, even in the absence of a specific request by the accused.  [T]o establish a *Brady* violation, a defendant has the burden to prove that: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the prosecution has suppressed the evidence, either willfully or inadvertently; and (3) the evidence was material, meaning that prejudice must have ensued.

*Bagnall*, 235 A.3d at 1085-86 (citations omitted).

We further note:

> "[I]mpeachment evidence is material, and thus subject to obligatory disclosure, if there is a reasonable probability that had it been disclosed the outcome of the proceedings would have been different."  In analyzing whether a defendant has demonstrated a reasonable probability of a different outcome, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Stated differently, a defendant shows a "reasonable probability" of a different outcome when the

government's suppression of evidence "undermines confidence in the outcome of the trial."

**Bagnall**, 235 A.3d at 1087 (citations omitted).

However, "no **Brady** violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." **Bagnall**, 235 A.3d at 1091 (citation omitted). **See also Commonwealth v. Sandusky**, 203 A.3d 1033, 1062 (Pa. Super. 2019) ("**Brady** is not violated when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from other sources.") (citation omitted).

Detective Hovan was suspended from the police department in January of 2018, "nearly five years after the underlying incident" occurred. Trial Ct. Op., 7/6/21, at 5. Appellant ignores trial prosecutor Attorney Varley's testimony that she was **not** aware of it when she was assigned this case in January 2020 and, importantly, the trial court's crediting this testimony. **See** N.T., 6/8/21, at 6; Trial Ct. Op., 7/6/21, at 7. **See also Commonwealth v. Hicks**, 151 A.3d 216, 222 (Pa. Super. 2016) ("[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.") (citation omitted). We note Appellant's reliance on federal decisions that impose the burden of ascertaining information solely on the Commonwealth. **See e.g. Dennis**, 843 F.3d at 293 ("To the extent that we have considered defense counsel's

- 12 -

purported obligation to exercise due diligence to excuse the government's non-disclosure of material exculpatory evidence, we reject that concept as an unwarranted dilution of ***Brady***'s clear mandate."). However, we apply the well settled Pennsylvania rule, that "no ***Brady*** violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." ***See Bagnall***, 235 A.3d at 1091; ***Sandusky***, 203 A.3d at 1062 (***Brady*** is not violated when the defendant, "with reasonable diligence, could have uncovered the evidence"). To this end, we agree with the trial court's reasoning:

> A quick Google search [of] Detective Mark Hovan would have revealed the suspension and could have been readily obtained by the defense.[16]
>
> ---
> [16] In fact, it was [Appellant's] family who discovered the suspension.

***See*** Trial Ct. Op., 7/6/21, at 6 & n.16. This finding is corroborated by Attorney Varley's testimony at the post-sentence hearing, that she "conducted a Google search" of "Mark Hovan suspension" and found approximately 13 articles. ***See*** N.T., 6/8/21, at 6-7.

Appellant further ignores the trial court's reasons for finding the evidence was **not** material to guilt or punishment. The court found:

> There is not a reasonably probability that if evidence that Detective Hovan was suspended for attending a church service nearly five years after the alleged criminal activity took place, the outcome of the proceedings would have changed. **Such result is unfathomable.** Additionally, it was the defense who called Detective Hovan to the stand and introduced him as their witness.[15] . . .

- 13 -

<hr>

[15] The Commonwealth did have Detective Hovan on their witness list and Detective Hovan did testify at the first trial. However, there is nothing to suggest, nor has [Appellant] provided any case law to suggest that the Commonwealth has to call every witness on their witness list

<hr>

It is also inconceivable that the entire defense theory of the case was based on Detective Hovan being a credible police witness **and not on the testimony of the [V]ictim**. [T]he uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant, despite contrary evidence from defense witnesses. Here, the [V]ictim testified to the gruesome details of the rape and the jury was able to view a drawing by the victim that showed a monster with a penis and with a "whole bunch of yellow stuff coming out of it at the end." Simply put, the [V]ictim's testimony alone was enough to convict [Appellant] of the above-mentioned charges.

Trial Ct. Op., 7/6/21, at 6-7 & n.15.

Finally, the trial court credited Attorney Varley's reasons why she did not call Detective Hovan to testify at trial: (1) she "usually reserve[s] the affiant" to testify last "in case there's anything we need to clean up[,]" such as the age of the victim or defendant, but here, "[a]ll of those things were taken care of through other witnesses[;]" (2) she determined Detective Hovan's testimony would have "no additional evidentiary value because the only thing he really did in this investigation was collect sheets and conduct a recorded interview with" Appellant, and the sheets produced no inculpatory evidence and Appellant did not admit any wrongdoing in the interview; and (3) she believed she met her burden of proof. *See* N.T., 6/8/21, at 8-9. For all the foregoing reasons, we decline to disturb the trial court's denial of relief on Appellant's ***Brady*** claim.

- 14 -

## IV. Comfort Dog

In his third issue, Appellant alleges the trial court erred in allowing the Victim to have a comfort dog in the witness box while she testified. He maintains: (1) "[t]he presence of the dog suggested [the Victim] was indeed a victim who had to be protected from [Appellant] and that even . . . the sheriff's deputies[' presence] was not sufficient to ensure her safety;" (2) "the dog's presence implicitly expressed a credibility determination in favor of the [Victim], unfairly prejudiced [Appellant], and denied him his right to due process[;]" (3) the Victim "had already testified in a prior trial and preliminary hearing without the aid of a comfort dog[;]" and (4) Appellant suffered prejudice, because "[a]ll of the charges depended on the credibility of the [Victim] as there was no other evidence . . . that Appellant committed a crime." Appellant's Brief at 17-20. Appellant further alleges that, in contravention of *Purnell*, 259 A.3d 974: (1) the Commonwealth provided no notice, and there was no evidence "the dog was in any way necessary . . . to help the [Victim] testify truthfully[;]" and (2) the court failed to provide a cautionary instruction. *Id.* at 18-19. We conclude no relief is due.

We first note the trial court's July 6, 2021, opinion addressed the **Superior** Court's opinion in *Purnell*,[16] which was then binding. *See* Trial Ct.

---

[16] *Commonwealth v. Purnell*, 233 A.3d 824 (Pa. Super. 2020), *aff'd*, 259 A.3d 974.

Op., 7/6/21, at 4-5. Subsequently, the Pennsylvania Supreme Court issued its decision in *Purnell* on September 22, 2021, approximately seven weeks after Appellant filed his notice of appeal. We apply the Supreme Court's decision to this appeal. *See Commonwealth v. Chesney*, 196 A.3d 253, 257 (Pa. Super. 2018) ("Pennsylvania appellate courts apply the law in effect at the time of the appellate decision [and] adhere to the principle that, 'a party whose case is pending on direct appeal is entitled to the benefit of changes in law which occur[ ] before the judgment becomes final.'") (citation omitted).

In *Purnell*, the Pennsylvania Supreme Court considered "the appropriate test to apply to a trial court's determination concerning whether a witness in a criminal case may utilize a 'comfort dog' for support during [their] trial testimony." *Purnell*, 259 A.3d at 977. The Court reasoned, "[I]t is indisputable that trial courts have broad discretion in controlling trial conduct." *Id.* at 984. To this end, Pennsylvania Rule of Evidence 611(a) provides:

> The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:
>
> > (1) make those procedures effective for determining the truth;
>
> > (2) avoid wasting time; and
>
> > (3) protect witnesses from harassment or undue embarrassment.

*Purnell*, 259 A.3d at 980, 985, *quoting* Pa.R.E. 611(a)(1)-(3). The Court held Rule 611 "is sufficiently comprehensive to allow a trial court to consider

- 16 -

whether a comfort dog may assist a witness in testifying in a truthful manner during a trial.[ ]" ***Purnell***, 259 A.3d at 985.

The Court then articulated the standard under which a trial court should address a witness' use of a comfort dog during trial:

> [W]e conclude that trial courts have the discretion to permit a witness to testify with the assistance of a comfort dog. In exercising that discretion, courts should balance the degree to which the accommodation will assist the witness in testifying in a truthful manner against any possible prejudice to the defendant's right to a fair trial and employ means to mitigate any such prejudice. We further note that an abuse of discretion occurs when a court "has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will."

***Purnell***, 259 A.3d at 986–87 (citation omitted). The Court noted:

> We find particularly persuasive the requirement that a trial court seek to minimize any potential prejudice to the defendant by, *inter alia*, considering the dog's training, providing the jury with limiting instructions, and employing means to limit the jury from viewing the dog.

***Id.*** at 986.

We note that in ***Purnell***, the Commonwealth filed pre-trial motions, which explained that an autistic and minor eyewitness[17] to a fatal shooting was afraid to talk and testify about a group of people, who were part of a gang related to the shooting, as well as the subsequent assault of another eyewitness. ***Id.*** at 977-78. The Commonwealth thus requested the presence

---

[17] The eyewitness was 13 years old at the time of the shooting, and approximately 15 years old at trial. ***See Purnell***, 259 A.3d at 977 & n.1.

of a "comfort dog" during the eyewitness's trial testimony. *Id.* The trial court conducted a hearing, at which defense counsel argued "the jury would see the dog and feel sympathy for" the eyewitness. *Id.* at 978. The court permitted the comfort dog. *Id.*

On review, the Supreme Court noted that the balancing test, which it had just announced, was not in place at the time of the defendant's trial. *Purnell*, 259 A.3d at 986. Nevertheless, the Court concluded the trial court's exercise of discretion was consistent with the balancing test. *Id.* It noted: (1) "**the trial court was put on notice**[,]" by way of the Commonwealth's pre-trial motions, of the eyewitness' fear of testifying against the defendant; and (2) "the court utilized several measures to mitigate against any potential prejudice the comfort dog could have caused." *Id.* (emphasis added). Pertinently, the trial court

> (1) referred to the animal as a "service dog" to lessen the likelihood that the dog's presence would engender sympathy from the jury; (2) required that the dog enter and exit the courtroom outside of the jury's presence and that the dog remain hidden under the witness stand throughout [the witness'] testimony; and (3) twice instructed the jury not to consider the presence of the dog for any purpose, not to attribute any sympathy to [the witness], and not to judge her credibility any differently.

*Id.*

To the extent Appellant argues *Purnell* imposed a requirement on the Commonwealth to provide pre-trial notice to a defendant, our review of the decision reveals no such pronouncement. Although the Court discussed the Commonwealth's pre-trial motion and hearing, its analysis focused on the

- 18 -

proper balancing test to be considered by a trial court. ***See Purnell***, 259 A.3d at 977-78, 984-86. Furthermore, the only mention of pre-trial notice pertained to the **trial court** being on notice, in terms of the court's response. ***See id.*** at 986 ("The trial court then wisely held a hearing to address the Commonwealth's motions[.]").

Furthermore, although the trial court cited the Superior Court's opinion in ***Purnell***, the Supreme Court did not reverse or overrule any holding in the Superior Court's decision, and indeed, affirmed its decision. ***See Purnell***, 259 A.3d at 987. In any event, the trial court's discussion informs our review. It reasoned:

> [The V]ictim had to endure and go through two separate trials over a period of five years. The first trial took place in 2015 and the second in 2020. This incident has taken an extreme mental and physical toll on the [V]ictim. Thus, the use of a comfort dog was permitted. This Court also tried to minimize the dog's presence. The [V]ictim and the dog were already at the witness stand before the jury was permitted to enter the courtroom. We simply cannot assume that the dog had a prejudicial impact on the jurors, much less that it engendered sympathy from them for the witness merely due to the dog's presence and not the impactful testimony presented by the [V]ictim.

Trial Ct. Op., 7/6/21, at 5.

We add the trial court referred to the animal as "a service dog" in front of the jury. N.T., 11/3/21, at 84. Although the court did not give any instruction to the jury about the dog as it relates to the Victim's testimony, Appellant did not request any such instruction. ***See id.*** at 83-84. Finally, there is no indication, and Appellant does not aver, that the dog caused or

was related to any disruption in the trial proceedings. **See Purnell**, 259 A.3d at 979 ("We . . . note that there is nothing in the record to suggest that the comfort dog was in any way disruptive to the trial."). Considering all the circumstances presented in this case, we decline to find the trial court abused its discretion, or acted with partiality, prejudice, bias or ill-will, in permitting the presence of the comfort dog. **See id.** at 986–87.

### V. Jury Instruction

In his final issue, Appellant asserts the trial court erred in denying his request for Pennsylvania Suggested Standard Criminal Jury Instruction 4.06, which charges the jury to

> examine closely and carefully and receive with caution the testimony of [*name of witness*] . . . if you find that he or she . . . [admitted that he or she committed perjury at another trial[18].]

**Id.** at 20, *quoting* Pa. SSJI (Crim) 4.06.[19] We note the instruction itself does not make any reference to a child witness. However, the subcommittee note refers to a child "of tender years" and advises:

> This instruction may be appropriate when the court wishes to caution the jury about testimony that falls into a category subject

_____

[18] Appellant does not address whether a preliminary hearing comes under the term "trial," as it appears in this criminal jury instruction.

[19] Appellant has preserved this issue for appellate review, as he objected **after** the trial court gave the jury instructions, and before the jury retired to deliberate. **See Commonwealth v. Knight**, 241 A.3d 620, 634 (Pa. 2020), (to preserve appellate challenge to jury instruction, defendant must raise objection after the charge is given but before jury retires to deliberate), *cert. denied*, 142 S.Ct. 1226 (U.S. 2022); N.T. Jury Trial Vol. III, 11/4/20, at 337.

to special scrutiny, *e.g.*, previously hypnotized witness, admitted perjurer, paid informer, **and, possibly, child witness**. . . .

\*     \*     \*

***Child of tender years.*** **When a child of tender years** testifies, it is within the discretion of the trial judge, after observing the child's testimony and mental and emotional maturity, whether to admonish the jury to scrutinize the child's testimony carefully. **The general charge on credibility will usually suffice.** *See Commonwealth v. Barnosky*, 400 A.2d 168 (Pa. Super. 1979).

Pa. SSJI (Crim) 4.06, *Subcommittee Note* (emphases added).

We also note the relevant standard of review:

When reviewing a trial court's jury instructions, we "will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper."

Additionally, we note that

[a] jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions.

*Sandusky*, 203 A.3d at 1098 (citations omitted).

We reiterate the Victim was eight years old at the time of the preliminary hearing, and 15 years old at the second trial. At this juncture, we set forth the following evidentiary context. On cross-examination of the Victim at **trial**, defense counsel introduced the following exchanges at the May 7, 2014, **preliminary hearing**:

- 21 -

[Defense Counsel:] Did you say anything today that wasn't the truth?

[The Victim: Y]es, but — no, I didn't say — I say that it wasn't the truth. I said that — no, no. I'm confused.

\* \* \*

Q. . . . I guess the question very simply is, everything you said today, did it happen?

[The Victim:] No.

\* \* \*

Q. . . . How about your mom, everything that you said your mom did today here that you told the judge, was that the truth or was that a lie?

[The Victim:] A lie.

N.T., 11/3/20, at 140,141.[20]

Appellant avers the trial court's general credibility instructions were insufficient, and the court should have also charged the jury to "take special care in evaluating the testimony of a child witness who has admitted to lying at a previous hearing," and it should "consider the child witness's inability to distinguish between the truth and a lie at the preliminary hearing." Appellant's Brief at 22. Appellant concludes he is entitled to a new trial. We disagree.

_____

[20] The May 7, 2014, preliminary hearing transcript was not included in the certified record on appeal. We glean the above exchange from defense counsel's reading of that transcript at trial. *See* N.T., 11/3/20, at 135-41.

First, Appellant ignores the Commonwealth's redirect examination of the Victim, which presented context to the defense's reading of isolated statements from the preliminary hearing transcript. *See* N.T., 11/3/20, at 142-44 ("I'm going to [read] the parts that the defense didn't read, okay?"). Following the Victim's statement (at the preliminary hearing) that what she said about her mother "was a lie," defense counsel asked the Victim, "What do you mean when you say that was a lie? What happened with mom after you told her what [Appellant] did?" *Id.* at 142. The Victim responded (at the preliminary hearing): "I forgot that part, too. That is not a lie. That is not a lie." *Id.* In reply to defense counsel's next question, "When you told your mom what happened with [Appellant], what did she do?," the Victim stated, "Spanked me." *Id.* at 142-43. Additionally, at the preliminary hearing, when asked if "[a]ll the things" the Victim said about **Appellant** were the truth or a lie, the Victim responded, "That's the truth." *Id.* at 142. Finally, when asked, "I guess the question very simply is, everything you said today, did it happen?," the Victim initially responded, "No," but immediately "corrected [her]self and said yes[.]" *Id.* at 143-44. At trial, the Commonwealth asked the Victim whether she, eight years old at the time, found the "questions confusing" and whether the defense asked her "questions in different ways." *Id.* The Victim replied, "Yes," to both queries. *Id.*

On appeal, Appellant ignores that the jury heard this rehabilitation of the Victim by the Commonwealth. Meanwhile, the trial court opined that in this particular trial, the general credibility jury instructions were sufficient:

> While this Court did not give the specific "special-scrutiny" instruction that Appellant requested, this Court explained to the jury that it must determine the credibility of the witnesses based upon various factors and even explained to the jury that it was their province to determine the [V]ictim's credibility and the weight that should be given to her testimony in light of evidence presented that she may have provided differing statements in prior proceedings. [N.T., 11/4/20, at 321-23.] Moreover, this Court explained to the jury that it was permitted to discount all a witness's testimony if it determined the witness testified falsely about any material point in this matter. [*Id.* at 322-23.]
>
> Therefore, in its entirety, this Court's jury charge repeatedly emphasized the importance of credibility determinations in the jury's deliberation process and provided the jury with more than enough information and guidance as to how to evaluate the credibility of all witnesses, including the [V]ictim in this matter. As a result, denying Appellant's request for a separate special-scrutiny instruction did not constitute reversible error.

*See* Trial Ct. Op., 10/26/21, at 4 (paragraph break added).

As explained above, the Commonwealth presented the testimony surrounding the Victim's statement, at the preliminary hearing, that some of her testimony was a lie. After reviewing the instructions as a whole, "and not simply isolated portions," we agree with the trial court's reasoning and decline to find any abuse of discretion by the trial court. *See Sandusky*, 203 A.3d at 1098. Accordingly, no relief is due.

## VI.  Conclusion

Finding no merit to any of Appellant's claims, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/09/2022